# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANTHONY TUCKER, | ) )  ) |
| *Plaintiff,* | ) ) No. 17 C 2331 |
| v. | ) ) Judge Virginia M. Kendall |
| CITY OF CHICAGO DETECTIVES J. LALLY, STAR NO. 21454; D. GILLESPIE, STAR NO. 20970; J. GONZALEZ, STAR NO. 20210; and THE CITY OF CHICAGO | ) ) ) ) ) ) |
| *Defendants.* | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Anthony Tucker sued Detectives John Lally, Daniel Gillespie, and Jacinto Gonzalez of the Chicago Police Department alleging unlawful pretrial detention and malicious prosecution stemming from his arrest in February 2014 for the armed robbery and murder of John Serpe. (Dkt. 67). Tucker claims the detectives fabricated evidence by way of improper photo array identifications, suggestive lineup procedures, and selective recording of witness statements. Neither party filed dispositive motions and a jury trial occurred in October 2019. The jury heard five days of testimony. At the close of evidence, Defendants moved for a directed verdict on all counts for all Defendants. (Dkt. 93). The Court heard oral argument on the Motion and found that Plaintiff had completely failed to establish any personal

involvement on the part of Detective Gonzalez[1]. The Motion was taken under advisement as to Detectives Lally and Gillespie pending the jury's deliberation and ultimate verdict. After deliberating, the jury returned a verdict for Plaintiff, and against Detectives Lally and Gillespie, as to unlawful pretrial detention and for all Defendants on the malicious prosecution count. (Dkt. 99). The jury awarded Plaintiff compensatory damages in the amount of $750,000.00 and declined to award any punitive damages. Following trial, Defendants Lally and Gillespie filed a Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) on the grounds that a reasonable jury could not find Detectives Lally and Gillespie lacked probable cause or were personally involved in Plaintiff's constitutional deprivation, and that they are entitled to qualified immunity. For the reasons detailed within, the Court denies both the Motion for Judgment as a Matter of Law and its renewed counterpart. (Dkts. 93, 113).

## BACKGROUND

On February 9, 2014, John Serpe was murdered on the west side of Chicago. Detectives Lally and Gillespie, detectives with the Chicago Police Department, were assigned as lead detectives for the Serpe murder. Mahagony Lewis and Monica Carter, both eye-witnesses to the murder, eventually identified Plaintiff as the shooter after purportedly improper, coercive, and suggestive interview techniques. Eventually, Plaintiff was arrested on February 16, 2014, and charged with first

---

[1] Due to the potential of significant prejudice to both sides, the Court did not immediately remove Detective Gonzalez from the matter and instead submitted the entire case to the jury. Nevertheless, the jury returned a verdict in favor of Detective Gonzalez on all counts. (Dkt. 99).

degree murder and armed robbery in Cook County. The case proceeded to a bench trial where, in May 2016, Plaintiff was found not guilty. Plaintiff then pursued the instant federal civil rights litigation where a jury of his peers found in his favor on the unlawful pretrial detention count against Defendants Lally and Gillespie, awarding him $750,000.00. Defendants now seek post-trial review of the jury's decision. The following is a summary of the relevant testimony and evidence developed at trial construed "strictly in favor of [Plaintiff]…" as the prevailing party. *Passananti v. Cook County,* 689 F.3d 655, 659 (7th Cir. 2012).

In the early morning hours of February 9, 2014, Monica Carter, while working as a prostitute, was robbed at gunpoint near the West Garfield Park neighborhood of Chicago. (Dkt. 105, 4:20-5:3). Carter testified that she did not personally know the offender, but that she had seen him before in the neighborhood. (*Id.* at 10:2-8). Afterwards, the man who robbed her forced Carter to follow him to go and "rob the drug dealers" near the intersection of Monroe and Kostner or else he would shoot her. (*Id.* at 5:4-6); (Dkt. 104, 160:1-2). On their way to that intersection, the two came across a car with a "white man and a young lady in it." (*Id.* at 6:1). The offender approached the car while at the same time holding Carter at gun point, shot the man, and proceeded to rob Mahagony Lewis, the female passenger. (*Id.* at 6:5-15; 6:18-7:10); (Dkt. 104, 160:14-18). Thereafter the offender left the scene and Carter and Lewis went their separate ways. (*Id.* at 7:9-23).

Later on February 9, Detectives Lally and Gillespie brought Lewis to a police station to look at various photos. (Dkt. 104, 24:6-14). While at the station, Detective

Lally showed Lewis a photo array of six individuals (not including a photo of Plaintiff), but Lewis was unable to identify any as the offender. (*Id.* at 28: 17-19); (Dkt. 104, 150:8-13). Lewis provided the detectives with a description of the offender as "a male black with medium to dark skin and tall" and that "he was wearing a black hoodie, a black jacket that had some type of white lettering on…black sweatpants and black shoes." (Dkt. 103, 16:4-11).

On February 13, 2014, Carter was interviewed by Detectives Lally and Gillespie regarding the February 9th robbery and murder. (Dkt. 105, 14:1-15); (Dkt. 103, 19:22-25). Carter testified that during the course of the interview Detective Lally told her that she could be charged with murder and that her son could be taken away from her. (*Id.* at 14:20-25). Eventually Carter told Lally and the other detective interviewing her that she knew the offender to be named Anthony and go by the nickname "Killer." (*Id.* at 17:13-20; 18:8-14). However, she testified that she did not, in fact, know "Killer" to be the offender, but just gave that name because she wanted to go home and was in heroin withdrawal. (*Id.* at 17:21-18:7). The detectives did not create a General Progress Report ("GPR") of this interaction with Carter. (Dkt. 103, 21:1-4).

Carter was brought back to meet with Detectives Lally and Gillespie at a separate time and was presented with a photo array of individuals. (Dkt. 105, 19:10-23); (Dkt. 104, 60:10-12); (Dkt. 103, 30:9-18). Carter testified that when Detective Lally handed her the photo array, a single photograph—that of Plaintiff—was already circled. (*Id.* at 21:1-8). When he took the witness stand, Detective Lally

testified that Carter, not he, circled the photograph of Plaintiff. (Dkt. 104, 165:2-9). She further testified that Detective Lally told her that "this was him and to initial it," which she did. (Dkt. 105, 21: 13-5; 22:3-7). The photograph she initialed next to was of Plaintiff. (Dkt. 104, 63:17-20). Detective Lally testified that the Chicago Police database did not recognize the nickname "Killer" to be associated with Plaintiff, but rather "Crip" (short for cripple) and "Slim." (*Id.* at 65:6-23). That same day, Detectives Lally and Gillespie showed Mahagony Lewis a photo array which included Plaintiff, but she was unable to identify any of the individuals as the offender. (*Id.* at 80:19-81:2); (Dkt. 103, 34:1-13). Detectives Lally and Gillespie conceded that Chicago Police Department procedures required they complete a report every time an individual is shown a photo array and that their failure to do so was in violation of that rule. (Dkt. 104, 177:16-178:5); (Dkt. 103, 34:19-35:8).

Carter testified she was brought back to the station on February 16, 2014, to meet with Detective Lally and observe a physical lineup. (Dkt. 105, 23:3-10). This time, Carter testified that Detective Lally picked her up and gave her "some money to go get [her] drugs" before viewing the lineup. (*Id.* at 23:15-24:12). Prior to entering the observation room, a detective showed Carter a picture of Plaintiff and was told by Detective Lally to make sure she picks the right person. (*Id.* at 25:3-14; 26:1-2; 28:21-23). Carter was unable to identify the specific detective who showed her the picture, but did note that Detective Lally was with that detective at the time. (*Id.* at 25:15-22). Detective Lally denied that he showed Carter a single photograph of Plaintiff before she entered the lineup room. (Dkt. 104, 186:13-16). Once in the lineup room,

Carter identified Plaintiff "because that was the picture that [she] saw before [she] walked in." (Dkt. 104, 31:11-14). Detective Lally testified on direct examination that no GPR was created for any interaction with Monica Carter even though nearly every other person interviewed was the subject of a GPR. (Dkt. 104, 47:14-19). Later in the investigation, Carter would go on to identify Plaintiff as the shooter at the grand jury because that is "who [she] was told to say in the beginning" and she was on drugs and did not care about the repercussions. (Dkt. 105, 33:20-34:1). On the same day, Lewis viewed a physical lineup with Detective Gillespie present. (Dkt. 103, 58:2-9). Ultimately, Lewis identified Plaintiff as "the person who shot John Serpe." (*Id.* at 59:8-12).

The Court heard testimony from Reginald Riley[2], Tucker, and Carter regarding the February 16, 2014, physical lineups. Riley testified that he was picked up by police officers on the morning of February 16 and eventually told he would be participating in a physical lineup. Riley noted that he was one of five men, including Plaintiff, in the lineup and that when they entered the lineup room, they were each given assigned seats. At a certain point during the lineup, Riley testified that the men were instructed to stand up and while the rest were standing shoulder to shoulder, Plaintiff was told to stand apart from the remaining four. Riley told the jury that this occurred during both of the physical lineups that day. Plaintiff

---

[2] Following trial, the parties ordered only select portions of the trial testimony to be transcribed into an official transcript. The testimony of Reginald Riley, Plaintiff, and Maurice Lloyd were not ordered by the parties. However, the Court has the benefit of having observed all testimony and a rough version of the entire transcript. As such, reference to the testimony of these witnesses is gleaned from the rough transcript.

similarly told the jury that he was specifically instructed where to sit in the lineup room and that when it was time for all the individuals to stand, he was made to stand separate and apart from the remaining individuals during both lineups. To the contrary, Carter, who viewed the physical lineup which included Riley and Plaintiff, testified that all the men in the lineup were standing shoulder-to-shoulder. (Dkt. 105, 89:25-90:1).

At no time during the investigation did the detectives attempt to obtain a search warrant for the residence where Plaintiff was arrested to search for a firearm or other evidence. (Dkt. 104, 11:7-12). However, Detective Lally did return to the Lloyd residence, the location Plaintiff was arrested, the day following Plaintiff's arrest. (*Id.* at 195:1-4). While there, Detective Lally spoke with Annie Lloyd, Marvin Lloyd, and Maurice Lloyd. (*Id.* at 195:13-18). Notably, Maurice Lloyd testified that he told Detective Lally on February 17, 2014, that Plaintiff was at the residence from the night of February 8, 2014 through the morning of February 9, 2014—the pertinent time frame of the Serpe murder. While on direct testimony, Plaintiff himself testified that he was at the Lloyd residence the entire night and into the morning. Detective Lally, testified that Maurice Lloyd instead told him that he could not remember one way or another whether Plaintiff was there. (Dkt. 104, 115:11-21). Because of this, Detective Lally only took statements and composed a GPR for Marvin Lloyd and Annie Lloyd. (*Id.* at 117:1-19). The report reflected that Marvin and Annie told Detective Lally that Plaintiff was not present at the time in question. (*Id.* at 121:10-15).

Detective Lally testified that throughout the entirety of the investigation, he never found any forensic or scientific evidence connecting Plaintiff to the scene of the crime. (Dkt. 104, 8:12-25).

## **LEGAL STANDARD**

Entering judgment as a matter of law is appropriate only if "a party has been fully heard on an issue during a jury trial [and] …a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *see Thorne v. Member Select Ins. Co.,* 882 F.3d 642, 644 (7th Cir. 2018). In evaluating a Rule 50 motion, the court must "give the nonmovant 'the benefit of every inference' while refraining from weighing … the credibility of evidence and testimony." *Ruiz-Cortez v. City of Chicago,* 931 F.3d 592, 601 (7th Cir. 2019) (quoting *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.,* 903 F.3d 618, 621 (7th Cir. 2018)). The court views all evidence in a light most favorable to the nonmoving party. *Id.* Only then, if the court finds that "no rational jury could have found for the nonmovant" may the court grant a Rule 50 motion. *Id.* In this posture the court's role is simply to assess "whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *May v. Chrysler Grp., LLC,* 716 F.3d 963, 971 (7th Cir. 2013).

## **DISCUSSION**

### I. Probable cause and Defendants' personal involvement

Defendants primarily argue that the detectives had probable cause to arrest Plaintiff, an absolute defense to a § 1983 action, and that Plaintiff failed to present

sufficient evidence that either Detective Lally or Detective Gillespie were personally involved in Tucker's unlawful pretrial detention. To the contrary, Plaintiff suggests that any probable cause Defendants purported to have was founded upon evidence fabricated by Detectives Lally and Gillespie in the form of tainted photo arrays, suggestive physical lineups, and a general attempt to ignore evidence which did not inculpate Plaintiff. Plaintiff cannot succeed on his constitutional claims against an amorphous state actor. Rather, he must establish a connection between Detectives Lally and Gillespie and his unlawful pretrial detention. *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017).

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chicago,* 442 F.3d 544, 547 (7th Cir. 2006). Probable cause exists where, "at the time of the arrest, the 'facts and circumstances within the officer's knowledge … are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Wagner v. Washington Cty.,* 493 F.3d 833, 836 (7th Cir. 2007) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). The probable cause analysis is conducted from the point of view of a reasonable person in the position of the officer. *Chelios v. Heavener,* 520 F.3d 678, 686 (7th Cir. 2008). Generally, probable cause can be based on a single witness, "unless the officer has a reason to question the witness' account." *Reynolds v. Jamison,* 488 F.3d 756, 765 (7th Cir. 2007). False statements and fabricated evidence cannot serve as the basis for

probable cause. *Alexander v. United States,* 721 F.3d 418, 423 (7th Cir. 2013). When probable cause is assessed in the context of factual disputes and differences of opinion, the jury is the proper arbiter of this issue. *Chelios,* 520 F.3d at 686.

The critical, and ultimately dispositive, question here then is whether Detectives Lally and Gillespie fabricated evidence in building their case against Plaintiff thereby rendering any probable cause finding meaningless. *See Lewis v. City of Chicago,* 914 F.3d 472, 477 (7th Cir. 2019) ("[F]alsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment."). No doubt the jury in this case heard testimony and evidence on both sides of the equation. The jury heard predominantly from Monica Carter, an individual considered to be a key witness by Detective Lally. Carter spoke of her interview with Detective Lally and how he suggested the possibility of her being charged and losing her son. (Dkt. 105, 14:20-25). She told the jury that she only gave the names "Killer" and Anthony because she wanted to go home and was in heroin withdrawal. (*Id.* at 17:21-18:7). Perhaps the most striking testimony from Carter was with regard to the first photo array she viewed. Carter testified that when Detective Lally handed her the sheet of photos the picture of Plaintiff was already circled. (*Id.* at 21:1-8). Similarly, the jury heard testimony that could give rise to reasonable suspicion stemming from the Detectives interactions with Mahagony Lewis. Detectives Lally and Gillespie showed Lewis a photo array, which included a photograph of Plaintiff, but Lewis was unable to identify Plaintiff, much less any of the other men, as the offender. (Dkt. 104, 80:19-81:2); (Dkt. 103, 34:1-13). Notably, both Detectives admitted upon examination they

violated Chicago Police Department policies by failing to document this unsuccessful identification. (Dkt. 104, 177:16-178:5); (Dkt. 103, 34:19-35:8).

Further, the jury heard testimony that could give rise to the conclusion that the physical lineups were not beyond reproach. Carter testified that prior to viewing the physical lineup she was shown a single picture of Plaintiff and was told by Detective Lally to make sure to pick the right person. (Dkt. 105, 25:3-14; 26:1-2; 28:21-23). Reginald Riley and Plaintiff testified that in both physical lineups, they were told to stand in a way that isolated Plaintiff from the rest of the "fillers."

Finally, Plaintiff elicited testimony concerning Detective Lally's choice to not take a statement from Maurice Lloyd, who provided an alibi for Plaintiff when he testified that he told Detective Lally Plaintiff was at his residence during the time of the robbery and murder. Detective Lally instead chose to take the statements of those witnesses who tended to show Plaintiff was *not* at the residence. (Dkt. 104, 115:11-21; 117:1-19)

Certainly, the jury also heard evidence from the defense that impeached Plaintiff's witnesses and presented an entirely different narrative. But Defendants' Motion attempts to challenge questions fundamentally within the province of the jury. "The jury heard all of the conflicting and inconsistent testimony, bad memories and impeachment and all, and then did precisely what it is called upon to do, which is make a credibility determination that was not manifestly outweighed by other evidence." *Galvan v. Norberg,* 2011 WL 1898237, at *8 (N.D. Ill. May 18, 2011), aff'd 678 F.3d 581 (7th Cir. 2012). The Court is not able to step in to the jury box and

reweigh the credibility of witnesses and testimony at this stage of the proceedings. *See Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 922 F.3d 778, 784 (7th Cir. 2019). This principle is all the more applicable here— a case where the jury was presented with diverging testimony and significant attempts at impeachment. *Whitehead v. Bond,* 680 F.3d 919, 925 (7th Cir. 2012) ("In cases involving simple issues but highly disputed facts (an apt description of this case), greater deference should be afforded the jury's verdict.") (parentheses in original).

In determining whether Detectives Lally and Gillespie had probable cause for the pretrial detention of Plaintiff, the jury obviously weighed the competing evidence and chose to credit Plaintiff's theory of the case. While the probable cause assessment is viewed from the perspective of a reasonable officer, "that does not mean that the jury was compelled to believe the officers' testimony in reaching a probable cause determination." *Fox v. Hayes,* 600 F.3d 819, 834 (7th Cir. 2010); *see e.g. Anderson v. Landrum,* 2015 WL 1538243, at *7 (N.D. Ill. Mar. 31, 2015) ("The jury clearly did not credit the officers' testimony in reaching its finding of no probable cause and it was not required to do so under the law."). Now, with a jury verdict for Plaintiff in hand, the Court only asks whether, under Plaintiff's version of events, "a reasonable officer could conclude that there was probable cause to arrest." *Id.* at 833-34. Indeed, the Court can only take the probable cause question from the jury when no rational jury could find otherwise. *See Stragapede v. C*ity of Evanston, 865 F.3d 861, 865 (7th Cir. 2017). "This is a high bar." *Ruiz-Cortez*, 931 F.3d at 601. And one that Defendants

cannot meet. The jury was presented with sufficient testimony and evidence from which they could reasonably conclude that Detectives Lally and Gillespie relied upon insufficient and fabricated evidence in detaining Plaintiff.

In response, Defendants' theory would have the probable cause analysis freeze at the moment probable cause was first obtained. That is not the case. Though true that the statement of a "single witness is generally sufficient to establish probable cause," an officer that has reason to question the witness' statement lacks probable cause. *Reynolds,* 488 F.3d at 765. Detectives Lally and Gillespie's duties did not end once they purported to initially meet the probable cause threshold. They are not permitted "to ignore the full context of the circumstances known to them." *Anderson,* 2015 WL 1538243, at *7 (citing *Guzell v. Hiller,* 223 F.3d 518, 520 (7th Cir. 2000)). The detectives did not have the luxury of burying their heads in the sand once they received the slightest information linking Plaintiff to the murder. Rather, the jury was free to conclude that Detectives Lally and Gillespie should have conducted further investigation due to reasonable suspicions about the veracity of the evidence supporting their probable cause determination[3]. *Spiegel v. Cortese,* 196 F.3d 717, 724 (7th Cir. 1999); *BeVier v. Hucal,* 806 F.2d 123,128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued…"); *Anderson,* 2015 WL 1538243, at *8 ("Based on this set of facts, if believed by the jury as the fact finder,

---

[3] Of note, the jury was instructed to this effect. (Dkt. 95, pg. 25) ("However, if the complaint would lead a reasonable officer to be suspicious the officer has a further duty to investigate. Additionally, police cannot close their eyes to information that undercuts probable cause."). Both parties agreed to this instruction after multiple rounds of jury instructions' conferences.

a reasonable police officer…should have inquired more…before concluding that there was probable cause to charge…"). The jury clearly credited Plaintiff's version of events that Detectives Lally and Gillespie manipulated photo arrays and physical lineups to highlight Plaintiff as the offender and failed to give credence to, or further investigate, potentially exculpatory evidence. Because fabricated and tainted evidence "cannot support a finding of probable cause," *Alexander,* 721 F.3d at 423, the Court cannot now reverse the jury's decision that probable cause did not exist. Holding otherwise would require the Court to construe the facts and all reasonable inferences *against* Plaintiff, a practice precluded at the post-trial phase. *Chelios,* 520 F.3d at 688.

In addition to finding that Defendants lacked probable cause to arrest Plaintiff, the jury was also presented with sufficient evidence to personally connect Detectives Lally and Gillespie to Plaintiff's constitutional deprivations. To prevail on a § 1983 claim, Plaintiff must present evidence or testimony linking Defendants to his constitutional deprivation. *Colbert,* 851 F.3d at 657. Here, both Detectives Lally and Gillespie were present for all key points of the investigation. Indeed, they were the lead detectives working the case and the jury could reasonably infer that they were "in" on the fabrication of evidence. *See e.g., Keri v. Folino,* 2019 WL 4201567, at *14 (N.D. Ill. Sept. 5, 2019) (finding sufficient personal involvement for purposes of § 1983 where the defendants were at least present at key interviews and interrogations). The jury heard testimony that Detective Lally conducted the first interview of Monica Carter where she was told she could be charged with murder and lose her son, that

Detective Lally was present when Carter was given a photo array with Plaintiff's picture already circled, that Detective Lally told Carter, before entering the physical lineup, to make sure she picks the right person, and that Detective Lally failed to document multiple key witness interviews in violation of Chicago Police Department policy. Similarly, Detective Gillespie was present when Carter was threatened with murder charges, did not document Mahagony Lewis's failure to identify Plaintiff in a photo array, and was present when Carter was given the already-circled photograph of Plaintiff. In short, the jury either heard direct testimony, or was presented with sufficient testimony to make reasonable inferences, connecting Detectives Lally and Gillespie to the fabrication of a photo array and physical lineup along with multiple failures of recording exculpatory witness statements and failed identifications.

At its core, this case was one of competing narratives and testimonial discrepancies. The resolution of these inconsistencies is a task left solely for the jury. Instead of opining on its view of the evidence or what the testimony established, the Court's only role at this juncture is to answer whether there was sufficient evidentiary basis for the jury to find in Plaintiff's favor. The Court answers that question in the affirmative and denies Defendants' Motions for Judgment as a Matter of Law.

## II. Qualified immunity

Defendants' second argument, that Judgment as a Matter of Law is warranted because the Detectives are entitled to qualified immunity likewise fails. "[Q]ualified immunity shields public officials from civil liability if their 'conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Allin v. City of Springfield,* 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). "A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran,* 807 F.3d 178, 182 (7th Cir. 2015).

No exhaustive review of the record or legal landscape is needed to dispose of this argument. The jury was presented with sufficient evidence to accept that Detectives Lally and Gillespie fabricated evidence and improperly conducted their investigation such that probable cause did not exist. Unequivocally, "[t]here was and is no disputing that [fabricating evidence] violates clearly established constitutional rights." *Dominguez v. Hendley,* 545 F.3d 585, 589 (7th Cir. 2008); *Lewis,* 914 F.3d at 477; *Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012). Viewing the evidence in Plaintiff's favor would permit a reasonable jury to find that Detectives Lally and Gillespie fabricated evidence used to arrest Plaintiff—a clearly established constitutional violation. Consequently, qualified immunity does not protect Defendants here.

## **CONCLUSION**

For the reasons outlined above, Defendants' Motions for Judgment as a Matter of Law are denied. (Dkts. 93, 113). In light of this decision, if Defendants desire to further pursue their presently-stayed oral motion for mistrial, Defendants shall file

a written motion within 14 days of the entry of this Opinion. Further, Defendants shall respond to Plaintiff's Bill of Costs (Dkt. 111) within 14 days of the entry of this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: January 6, 2020